Christopher S. Marchese, (SBN 170239) marchese@fr.com
Olga May, (SBN 232012) omay@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Roger Borovoy (SBN 31209) borovoy@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5021
Facsimile: (650) 839-5071

Attorneys for Defendant ArcSoft, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| e.Digital Corporation,<br><br>             Plaintiff,<br><br>      v.<br><br>ArcSoft, Inc., dba as Closeli and as simplicam,<br><br>             Defendant. | Case No. CV-15-0056 BEN (DHB)<br><br>**DEFENDANT ARCSOFT, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Date:   January 21, 2016<br>Time:  9:30 a.m.<br>Courtroom:  5A, Schwartz Bldg.<br><br>Hon. Roger T. Benitez |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................... 1

II.     FACTUAL BACKGROUND ..................................................... 2

        A.      e.Digital's Litigation on the Asserted Patents ................ 2

        B.      Overview of the Technology in the Asserted Patents ......... 3

        C.      Terms Proposed for Construction ................................... 6

III.    LEGAL STANDARD FOR CLAIM CONSTRUCTION ............ 8

IV.     ARGUMENT ............................................................................ 9

        A.      e.Digital Is Collaterally Estopped from Challenging
                Judge Tigar's Constructions ......................................... 9

        B.      "First detected sensor value/"second detected sensor
                value" ........................................................................ 11

        C.      "Social signature" ...................................................... 15

                1.      ArcSoft's Proposed Construction vs. Judge
                        Tigar's Construction ......................................... 15

                2.      ArcSoft's Proposed Construction vs. e.Digital's
                        Original Construction ....................................... 18

        D.      "Social hierarchy" ..................................................... 19

                1.      ArcSoft's Construction vs. Judge Tigar's
                        Construction ..................................................... 19

                2.      ArcSoft's Construction vs. e.Digital's Original
                        Construction ..................................................... 20

        E.      "Social template" ....................................................... 22

                1.      ArcSoft's Construction vs. e.Digital's Agreed-
                        upon Construction in the Dropcam case ............. 22

                2.      ArcSoft's Construction vs. e.Digital's Original
                        Construction ..................................................... 23

V.      CONCLUSION ....................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cat Tech LLC v. TubeMaster, Inc.*,
    528 F.3d 871 (Fed. Cir. 2008) ..................................................................8, 15, 23

*Clements v. Airport Auth.*,
    69 F.3d 321 (9th Cir. Nev. 1995) ...................................................................... 10

*Curtiss-Wright Flow Control Corp. v. Z&J Techs. GmbH*,
    563 F. Supp. 2d 1109 (C.D. Cal. 2007) ........................................................... 10

*e.Digital Corp. v. Futurewei Techs., Inc.*,
    772 F.3d 723 (Fed. Cir. 2014) ........................................................................... 9

*Lummus Co. v. Commonwealth Oil Ref. Co.*,
    297 F.2d 80 (2d Cir. 1961) ............................................................................... 10

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ............................................................................................ 8

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992) ............................................................................. 10

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ....................................................................... 17

*Middleton, Inc. v. Minnesota Mining & Mfg. Co.*,
    311 F.3d 1384 (Fed. Cir. 2002) ...................................................................8, 15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ....................................................................... 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................8, 9, 18, 21

*Syverson v. IBM*,
    472 F.3d 1072 (9th Cir. 2007) ......................................................................... 10

*TM Patents, L.P. v. IBM Corp.*,
    72 F. Supp. 2d 370 (S.D. N.Y. 1999) ............................................................9, 10

*Zdanok v. Glidden Co., Durkee Famous Foods Div.*,
   327 F.2d 944 (2d Cir. 1964) ................................................................. 10

**Statutes**

28 U.S.C. § 1291 ................................................................................. 10

# I.   INTRODUCTION

e.Digital's proposed constructions are overbroad and seek to expand the scope of the patent claims in an effort to reach products that are far outside the scope of the claimed invention.  Such broad, vague constructions defeat the purpose of claim construction and will be of no help during infringement analysis to either this Court or the jury.

e.Digital's asserted patents are directed to a communication device, such as a mobile phone, that can regulate contact with the user and/or vary the amount of information provided about the user based on the user's current activity.  The stated goal is to allow the device to automatically minimize disruptions or invasions into the user's life.  The system is capable of constant monitoring of various aspects of what the user is doing and reporting the details to people with the right authorization.

The device uses sensors, such as light, sound, or motion sensors, to determine what activity the user is engaged in, where the user is located, who the user is with, for how long, or what activity is taking place around him.  The sensor data is then compared with stored sensor value ranges, which represent a "social signature"—an indication of the details of the activity.  The social signature is used to select a "social template," which determines whether to allow contact with the user and how much information to share about the user.  The social template makes these determinations based on the "social hierarchy" it contains.  The "social hierarchy" ranks people who may contact the user or receive information about the user and then allows or does not allow contact and shares varied amounts of information based on these rankings.

ArcSoft does not make communication devices that would fall within the scope of the claim terms.  Accordingly, e.Digital is trying to stretch the patent claims beyond their natural and legal scope to reach the accused ArcSoft security camera and security service that notifies its users of a potential intrusion.  To date, e.Digital has filed at least three such cases trying to broaden the scope of its patents to capture security

cameras and services.   e.Digital's overbroad and vague constructions should be rejected.

Finally, in the Northern District of California Dropcam case, where e.Digital asserts the same five patents at issue here (plus one more), Judge Tigar recently issued a claim construction order that includes constructions of "social signature," "social hierarchy," and an agreed-upon construction of "social template."   [Ex. A, Judge Tigar's Order (citations to exhibits are citations to the exhibits to the Declaration of Christopher S. Marchese in Support of Opening Claim Construction Brief).]   e.Digital should be collaterally estopped from rearguing those constructions.   But even assuming collateral estoppel does not apply, e.Digital is not entitled to constructions that would be broader than the constructions issued or agreed to in the Dropcam case.

## II.   FACTUAL BACKGROUND

### A.   e.Digital's Litigation on the Asserted Patents

e.Digital alleges infringement of five patents: United States Patent Nos. 8,306,514; 8,311,522; 8,311,523; 8,311,524; and 8,315,619, each titled "System and Method for Managing Mobile Communications" (collectively "the asserted patents"). [Exs. B – F.]   e.Digital does not appear to use this technology in any products but has filed at least three cases asserting these patents against companies that make security cameras and provide security services[1]:

1)      the present case against ArcSoft in this District;

2)      *e.Digital Corporation v. Dropcam, Inc.*, Case Number: 3:14-cv-04922-JST ("the Dropcam Case"), originally filed in this district but transferred to the Northern District of California on Dropcam's motion;

---

[1] e.Digital has numerous other cases pending, including over two dozen in this District.   [Ex. G]   It appears to have only one product—a portable media player offered to airlines for use as an in-flight entertainment device, and derives its income from litigation.   *See, e.g.,* https://en.wikipedia.org/wiki/E.Digital_Corporation (e.Digital 10-K annual statement filed on June 16, 2009, "Our recent profitability has resulted from one-time patent licensing revenues and there is no assurance of future licensing revenues from new licensees.").

3)   *e.Digital Corporation v. Digital Corporation v. ShenZhen Gospell Smarthome Electronic Co., Ltd. (dba Oco Camera)*, Case Number 4:15-cv-00691-JST ("the Oco Case"), pending in the Northern District of California.

In the Dropcam case, Judge Tigar issued a claim construction order on November 30, 2015. Most of the terms proposed for construction in the Dropcam case overlapped with the terms in the present case. As summarized below, the parties agreed to adopt several of the constructions issued by Judge Tigar. [D.I. 45.] To further reduce the number of disputes, ArcSoft offered to adopt Judge Tigar's constructions of "social signature" and "social hierarchy" in a modified form, and to adopt the construction of "social template" to which e.Digital already agreed in the Dropcam case, but e.Digital declined to stipulate here.

**B.   Overview of the Technology in the Asserted Patents**

All five asserted patents stem from the same application and share the specification. The '522 patent is the parent of the other four.

Generally, the claimed invention purports to solve the problem of "pervasive communication technologies" that have provided "direct access to mobile device users worldwide." [Ex. C, '522, 1:13-18.] Such freely available access can become a burden because it can "inadvertently interrupt other activities which socially take precedence," for example, have a phone ring in the middle of a conversation. [Ex. C, '522, 1:18-21.] The invention relates to "automatically determining if an incoming communication is interruptive, and more particularly to the classification of a person's current actions" so that certain callers can assess, automatically or manually, how intrusive their communication will be. [Ex. C, '522, 1:7-11.]

The primary example provided in the specification describes a mother and baby napping and handling a communication request to the mother during that time. The mother's mobile device has sensors, including a light sensor and a sound sensor. The data from the light sensor indicates a dim room, the data from the sound sensor

indicates rhythmic breathing. Other sensor data indicates that the location is a known room in a house such as a nursery, and the motion signature is static—the user is not moving. Therefore, the social signature is that of the mobile phone user (mother) and baby napping. [Ex. C, '522, 15:31-36.]

The user's social signature is then compared with the social signatures of social templates stored by the system to find the most corresponding template. Where the social signature is that of the mobile phone user and baby napping, the specification gives an example of a social template that is "do-not-disturb-due-to-Mother-and-baby-sleeping." This template is set forth in Tables 1 and 2 below. [Ex. C, '522, 15:43-16:14.]

Table 1 shows the social signature for "do-not-disturb-due-to-Mother-and-baby-sleeping":

### TABLE 1

do-not-disturb-due-to-Mother-and-baby-sleeping social signature

| Sensor | Value range |
| --- | --- |
| Location | 39.78° N, 104.88° W ±5 m |
| Inertial | 0 m/s² ± .2 m/s² |
| Optical | 223 lm ± 15 lm |
| Acoustic | −63 db ± 5 db |

Table 2 shows the social hierarchy for "do-not-disturb-due-to-Mother-and-baby-sleeping":

### TABLE 2

do-not-disturb-due-to-Mother-and-baby-sleeping social hierarchy

| Social Hierarchy | Information |
| --- | --- |
| First Social Hierarchy Level-Father | Provide information on location, duration of state, and |

## TABLE 2-continued

do-not-disturb-due-to-Mother-and-baby-sleeping social hierarchy

| Social Hierarchy | Information |
| --- | --- |
| | estimate of baby sleep time |
| Second Social Hierarchy Level-Friend | Provide information on baby sleeping |
| Third Social Hierarchy Level-School, Work | Do not disturb except in emergency |
| Fourth Social Hierarchy Level-Strangers | Do not disturb |

The social signature is used to determine how to respond if someone tries to communicate with the user's (mother's) device, i.e., call the mother during the nap. [Ex. C, '522, 22:23-26.] The social template regulates response and information shared about the mother according to the rank of that someone in the social hierarchy:

- A communication from the Father is assigned the First Social Hierarchy Level. The social template will let the Father know that Mother's mobile device is with the baby, the location, for how long, and who is napping (both Mother and Baby or Baby only);
- A communication from the neighbor is assigned the Second Social Hierarchy Level and allows less information: the social template only indicates that the Baby is sleeping, so that the neighbor or friend can make an informed choice about whether to place the call, or to instead send an email or text. But the social template does not share as much detail as to the location and duration of the social signature;
- A communication from the office is assigned the Third Social Hierarchy Level and allows even less information. The social template will only indicate that the mobile phone user does not want to be disturbed, except in an emergency. But the social template provides specific information about when the call would be welcomed;
- A communication from the stranger is assigned the Fourth Social Hierarchy Level. The social template will indicate only that the caller is not to be disturbed. The social template could also direct any such calls straight into a voice mail to block reception entirely. [*See id.,* 16:27-64.]

Exemplary claim 1 of the '522 patent is recited below (with disputed terms shown in bold):

1. A system to automatically provide differing levels of information according to a predetermined **social hierarchy**, the system comprising:

a communication device comprising a sensor set which detects sensor data comprising a **first detected sensor value** comprising an amount of light of the environment of the communication device from an optical sensor and a **second detected sensor value** comprising a sound level of the environment of the communication device from an acoustic sensor, and transmits the sensor data;

a memory which stores **social templates**, each **social template** corresponding to a unique **social signature** comprising a first sensor value range and a second sensor value range other than the first sensor value range and each **social template** being selectable to provide, for each level of the predetermined **social hierarchy**, a corresponding differing amount of information to each member of the predetermined **social hierarchy**; and

a server comprising a processor which receives the sensor data from the communication device, creates a detected **social signature** from the received sensor data, determines which of the **social signatures** of the stored **social templates** has a greatest correspondence with the created **social signature** through comparison of the first and second detected sensor values and the first and second sensor value ranges of each stored **social template**, retrieves from the memory the determined one **social template** having the greatest correspondence and having the detected amount of light within the first sensor value range and the detected sound level within the second sensor value range, and provides to at least one member of the predetermined **social hierarchy** only as much information as allowed based on the retrieved **social template**.

## C.    Terms Proposed for Construction

As indicated in the quoted claim above, the following terms are proposed for construction by this Court.  The table below also indicates the parties' respective positions and the constructions assigned by Judge Tigar in the Dropcam case:

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|---|---|---|---|
| First detected sensor value | plain and ordinary meaning | one of multiple possible light measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|---|---|---|---|
| Second detected sensor value | plain and ordinary meaning | one of multiple possible acoustic measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |
| Social signature | raw or processed data and/or other information based on sensors | a combination of processed sensor data indicative of a type of activity | a combination of processed sensor data and/or other information based on sensors |
| Social hierarchy | an arrangement of persons, things, information and/or operations in a series of levels | an arrangement of persons or their representations in a series of ordered levels | an arrangement of persons and/or operations in a series of ordered levels |
| Social template | 1. Construction e.Digital originally proposed in the present case:<br><br>"parameters and/or information for analysis of social signatures"<br><br>2. Construction e.Digital agreed to in the Dropcam case:<br><br>"data structure associated with a social hierarchy and one or more social signatures" | data structure associated with a social hierarchy and a social signature | Not construed by Judge Tigar |

## III.    LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is a matter of law for the Court.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  Generally, claim construction involves considering "the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

The specification, in conjunction with the prosecution history and the prior art cited during the patent prosecution, serve as intrinsic evidence and can be used to ascertain the true meaning of the disputed claim terms.  *Phillips*, 415 F.3d at 1319-24.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quotation omitted).

"The appropriate starting point for claim construction 'is always with the language of the asserted claim itself.'" *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 884 (Fed. Cir. 2008) (citations omitted); *see also, e.g., Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002).  Next, the specification "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.  The prosecution history, which records the inventor's interactions with the Patent Office, is also instructive because it "provides evidence of how the PTO and the inventor understood the patent" and "was created by the patentee in attempting to explain and obtain the patent." *Id.* at 1317.

Though less significant than the intrinsic record, courts may also rely on extrinsic evidence during claim construction, such as dictionaries and technical treatises.  *Phillips*, 415 F.3d at 1317-18.  But the Federal Circuit has cautioned that the emphasis should remain on the intrinsic evidence in deciding "the legally operative meaning of claim language." *Id.* at 1317 (internal citations and quotations omitted).  The court may rely on a dictionary definition only "so long as the dictionary

definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

## IV. ARGUMENT

### A. e.Digital Is Collaterally Estopped from Challenging Judge Tigar's Constructions

"Collateral estoppel applies if: (1) the issue necessarily decided in the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against which collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014) (citing *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000)). The same is true in the context of claim construction. *See e.Digital Corp.*, 772 F.3d at 726 ("We hold that the district court correctly applied collateral estoppel to [the claim construction of] the '774 patent because reexamined claim 33 recites the sole memory limitation identical to claims 1 and 19…").

Here, with respect to the constructions issued by Judge Tigar, the first and third elements of collateral estoppel are not in dispute. The Dropcam case was litigated by the same plaintiff (and same counsel) and involved the same five patents and overlapping terms at issue here.

As to element (2), the constructions issued for those terms in the Dropcam case were a final judgment on the merits as to the meaning of those terms. This very issue of whether claim construction in a previous case is a final judgment was considered in *TM Patents, L.P. v. IBM Corp.*, 72 F. Supp. 2d 370, 375 (S.D. N.Y. 1999), and the court found it was a final judgment binding in a later case: "[R]esolution of the meaning of certain disputed patent terms following a Markman hearing, at which TM had a full and fair opportunity to litigate the meaning of those terms, is binding on the Plaintiffs in this action." *TM Patents, L.P. v. IBM Corp.*, 72 F. Supp. 2d 370, 375 (S.D. N.Y. 1999).

TM adopts the simple and straightforward position that no final, appealable judgment means no finality for collateral estoppel purposes. Unfortunately for TM, that is not the law in this Circuit (or any other, for that matter). Since Judge Friendly's seminal opinion in *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961), it has been settled that a judgment that is not "final" in the sense of 28 U.S.C. § 1291 can nonetheless be considered "final" in the sense of precluding further litigation of issues that were actually determined in such a judgment. Whether a ruling is sufficiently final turns on "such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *See id*. As Judge Friendly observed, "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Id.*; *see also Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 955 (2d Cir. 1964); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992).

*TM Patents*, 72 F. Supp. 2d at 375-76; *see also Curtiss-Wright Flow Control Corp. v. Z&J Techs. GmbH*, 563 F. Supp. 2d 1109, 1122 (C.D. Cal. 2007). Resolution of an issue can be final for purposes of issue preclusion "even though there are to be further proceedings on remand on the merits." *Syverson v. IBM*, 472 F.3d 1072, 1079 (9th Cir. 2007); *see also* FED. PRAC. & PROC. § 4434 ("[I]ssue preclusion [has been applied] to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief."); *Clements v. Airport Auth.*, 69 F.3d 321, 330 (9th Cir. Nev. 1995) (stating that the "most purely public purpose" served by preclusion rules is that of 'preserving the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results.'").

The same is true here. Judge Tigar issued a final, not tentative, claim construction order to be used for the rest of the Dropcam case. e.Digital had ample opportunity, under the Local Patent Rules of the Northern District, to propose constructions, meet and confer, file an opening and reply brief, and present argument at the hearing. The claim construction process culminated in Judge Tigar's order, when the claim construction issues "reached such a stage that a court sees no really

good reason for permitting it to be litigated again" by e.Digital. *TM Patents*, 72 F. Supp. 2d at 376. Permitting re-litigation would only give e.Digital a second bite at the apple and create a risk of inconsistent rulings. Therefore e.Digital is collaterally estopped from re-arguing the constructions issued in the Dropcam case.

In contrast, ArcSoft was not "a party or in privity with a party" in the Dropcam case and never had a chance to litigate these issues. Therefore, in contrast to e.Digital, ArcSoft is free to propose new constructions to this Court without taking a second bite at the apple.

ArcSoft, however, does not intend to reargue every single issue and has already agreed to several of Judge Tigar's constructions to reduce the issues in dispute (e.Digital agreed to only one).[2] But ArcSoft believed it necessary to propose modifications to some of Judge Tigar's constructions as explained below.

Finally, in an abundance of caution in the event collateral estoppel were not found to apply, ArcSoft will also address e.Digital's original proposed constructions in addition to Judge Tigar's.

**B.** **"First detected sensor value/"second detected sensor value"**

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|------|-----------------------------------|----------------------------------|----------------------------|
| First detected sensor value | plain and ordinary meaning | one of multiple possible light measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |
| Second detected sensor value | plain and ordinary meaning | one of multiple possible acoustic measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |

---

[2] The parties filed an amendment to the original Joint Claim Construction Statement reflecting these changes. [D.I. 45.]

The "purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id*. at 1361. Thus, contrary to e.Digital's suggestion, it is inappropriate to find that a term "needs no construction" or has a "plain meaning" if this does not resolve the parties' dispute over its scope. *Id*.

As a threshold matter, Judge Tigar did not construe these two terms specifically, but he did construe "sensor value range" as "range of measurements between two values." [Ex. A, Order at 2:1-2.] e.Digital stipulated to this construction in the present case. [D.I. 45.] The terms appear in the following context which shows they are directly related:

> a communication device comprising a sensor set which detects sensor data comprising a **first detected sensor value** comprising an amount of light of the environment of the communication device from an optical sensor and a **second detected sensor value** comprising a sound level of the environment of the communication device from an acoustic sensor, and transmits the sensor data;
> a memory which stores social templates, each social template corresponding to a unique social signature comprising a **first sensor value range** and a **second sensor value range** other than the first sensor value range and each social template being selectable to provide, for each level of the predetermined social hierarchy, a corresponding differing amount of information to each member of the predetermined social hierarchy;

ArcSoft's construction of "first detected sensor value"/"second detected sensor value" flows from Judge Tigar's construction of "sensor value range." Because a range of values is a range of measurements, each value is necessarily "one of multiple possible [light/acoustic] measurements" within that range.

This construction is also evidenced by the claim language itself: "a first detected sensor value comprising *an amount* of light" and "a second detected sensor

value comprising a sound ***level***."  "An amount" and "a level" are concrete measurements of light and sound detected and sent by the sensor.

The specification also makes clear that the sensors sense data in measurements, for example:  "In the shown mobile device 100, additional user social statistics sensors are ***measured*** using the optical sensor 130 and the acoustic sensor 140."  [Ex. C, '522, 9:29-32.]  "The acoustic sensor 140 may generate acoustic ***measurement*** data continuously, or at a sampling rate that may be fixed or variable."  [Ex. C, '522, 41-43.]  "The optical sensor 130 may generate simple light level ***measurement*** data continuously, or at a sampling rate that may be fixed or variable.  The optical sensor 130 provides the light level ***measurement*** to an optical processor 135."  [Ex. C, '522, 51-54.]

The specification also recites measurements taken by other types of sensors, for example by inertial sensors: "The inertial sensor 120 may ***measure*** accelerations along a single axis or multiple axes, and may ***measure*** linear as well as rotational (angular) accelerations.  [Ex. C, '522, 11:16-18; *see also* 11:19-29; 12:64-13:7; 13:23-26; 13:31-36; 13:48-51; 9:24-34.]  The specification also gives examples of specific measurements, in units of measurement, for light and sound values:  "the optical sensor 130 senses a light value of 223 lm, and the acoustic sensor 140 senses a sound level of -63 db."  [Ex. C, '522, 16:16-18; *see also* Table 1 (listing specific value ranges for a sensor on a "plus/minus" basis); 13:65-67, 14:1-3, 15:4-9, 16:14-23, 17:66-67, 18:1-13, 19:20-33, 19:51-58.]

The same is demonstrated by the prosecution histories of the asserted patents.  For example, in the prosecution history of the '522 patent, the Examiner Interview Summary dated September 11, 2012, summarizing interview with the applicant on August 22, 2012, explicitly refers to sensor optical and acoustic measurements:

> Examiner suggesting the adding of the specific ***sensors of optical and acoustic measurements and ranges*** and the comparison done to the received ***sensor measurement*** to determine the social template to which the limited amount of information is to be disclosed within the social hierarchy.

[Ex. H, '522 prosecution history (USPTO Proceeding No. 12/891875) at pp. 117 (examiner's summary of Aug. 22, 2012 interview), pp. 106-115 (April 27, 2012 amendment by applicant); Ex. I, '523 prosecution history (USPTO Proceeding No. 13/047,290) at p. 143 (examiner's summary of Aug. 23, 2012 interview), pp. 134-141 (applicant's Sep. 17, 2012 statement of the Aug. 15 and 23, 2012 discussions with examiner), pp. 119-133 (May 11, 2012 amendment by applicant); Ex. J, '524 prosecution history (USPTO Proceeding No. 13/047,306) at p. 161 (examiner's summary of Aug. 23, 2012 interview), pp. 144-154 (May 16, 2012 amendment by applicant), pp. 155-159 (applicant's Aug. 31, 2012 statement of Aug. 13, 15, and 23, 2012 discussions with examiner); Ex. K, '514 prosecution history (USPTO Proceeding No. 13/047,206) at p. 191 (examiner's summary of Aug. 22, 2012 interview), pp. 162-175 (April 27, 2012 amendment by applicant), pp. 176-189 (applicant's statement of Aug. 13, 15, and 23, 2012 discussions with examiner).

Further, because the sensor value range has been construed to be "between two values," each value within it is necessarily a measurement "between a high and low value." Otherwise values could be any values outside the range recited by the claims, rendering the claims meaningless. The '522 specification lists examples of such high and low values in Table 1, defined as a "plus/minus" to a certain value:

| Sensor | Value range |
|--------|-------------|
| Location | 39.78° N, 104.88° W ±5 m |
| Inertial | $0 \text{ m/s}^2 \pm .2 \text{ m/s}^2$ |
| Optical | 223 lm ± 15 lm |
| Acoustic | −63 db ± 5 db |

Finally, the value is used to develop a social signature. [*See, e.g.,* Ex. C, Table 1 (listing values under the range for the specific signature in the table).

## C.    "Social signature"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's Construction |
|------|-----------------------------------|--------------------------------|----------------------------|
| Social signature | raw or processed data and/or other information based on sensors | a combination of processed sensor data indicative of a type of activity | a combination of processed sensor data and/or other information based on sensors |

### 1.    ArcSoft's Proposed Construction vs. Judge Tigar's Construction

ArcSoft's proposed construction is supported by the language of the claim itself and the specification.  It is a modified version of Judge Tigar's construction, from which it differs in only two respects:  (i) ArcSoft does not believe that the construction should include "and/or other information based on sensors" and (ii) ArcSoft believes that the construction should include "indicative of a type of activity."

### a.    "and/or other information based on sensors"

"The appropriate starting point for claim construction 'is always with the language of the asserted claim itself.'"  *Cat Tech LLC*, 528 F.3d at 884; *see also, e.g.,* *Middleton*, 311 F.3d at 1387.  The language of the claim refers to "sensor data" but not, as e.Digital argues, "and/or other information based on sensors":

…a communication device comprising a sensor set which detects ***sensor data*** comprising a first detected sensor value comprising an amount of light of the environment of the communication device from an optical sensor and a second detected sensor value comprising a sound level of the environment of the communication device from an acoustic sensor, and transmits ***the sensor data***;

a memory which stores social templates, each social template corresponding to a unique **social signature** comprising a first sensor value range and a second sensor value range…;

The claim language starts by referring specifically to "sensor data" comprised of detected sensor values, and later returns to referring to "***the*** sensor data," signifying that this is the same and only "sensor data" as mentioned in the beginning of the claim.

Because the data may come from several sensors, it can be a "combination of processed sensor data," but nowhere in the claim does it add any "other information based on sensors." This addition would only make the claim vague and ambiguous—if the "other information" was not sensor "data," then what else can it be, and how is it "based on the sensor"? The explicit claim language makes any other evidence irrelevant and confusing. Adding "other information based on sensor" to a construction that already includes "sensor data" would make it redundant and ambiguous. Instead of clarifying the term, e.Digital's proposed construction would only create confusion and undermine the purpose of claim construction.

Judge Tigar's construction included "and/or other information based on sensors." The rationale provided in his order was that "the specification of the '522 patent includes an embodiment wherein location information retrieved from a sensor could be compared with 'map data' to determine the 'restaurant, store, office, or other like location' at which the sensor is located." [Ex. A, Order at 4:6-8.] But this rationale does nothing to explain why the "location information retrieved from a sensor" is not "sensor data," in this instance location data from a location sensor. [Ex. C, '522, 3:48-50 ("the sensor set comprises: a location sensor which senses a location of the communication device.")]. The "map data" referenced in the specification, with which the "location information retrieved from a sensor" is compared by the processor, could not have also come from the sensor, because then there would be no reason to compare the two. If the processor has access to "map data" to compare it with the location sensor data, the map data must be stored in the memory and available for such comparisons.

Accordingly, the only "information based on the sensors" is sensor data.

### b. "indicative of a type of activity"

First, the specification directly states that "***Each social signature is indicative of a different type of activity***." [15:29-30.] "Each" means that there is no social signature that would not be indicative of a type of activity. This alone is sufficient

proof that "indicative of a type of activity" should be part of the construction of "social signature."

Second, where the specification "repeatedly and consistently describes" the overall invention in a particular way, that description defines the construction. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (where the specification repeatedly and consistently described the local and remote systems of the claimed inventions as communicating directly over a telephone line, the court construed "sending," "transmitting," and "receiving" to require that the data packets travel over a telephone line and not a packet-switched network).

Here, the specification consistently and repeatedly refers to the invention as seeking to classify or indicate the current activity associated with the user:

- Under "Field [of Invention]", the patentee stated: "Aspects of the invention relate to automatically determining if an incoming communication is interruptive, and more particularly to the ***classification of a person's current actions***…" [Ex. C, '522, 1:7-9];
- "While access has given users the convenience of communication at all times this convenience in many cases is a burden as callers can inadvertently interrupt ***other activities*** which socially take precedence." [*Id.,* 1:15-18];
- "FIG. 3 illustrates a flow diagram for a method of social monitoring ***activity sensors*** in accordance an embodiment of the present invention." [*Id.,* 8:60-62; Fig. 3];
- "Embodiments of the present invention are designed to monitor ***social activity*** using multiple sensors." [*Id.,* 9:5-6];
- "A ***user's activity*** is classified based on the set of social statistics obtained from the sensors" [*Id.,* 9:11-13];
- "Examples of ***user activities*** include driving, napping, in a meeting, showering, etc." [*Id.,* 9:15-17];
- "For instance, specific patterns of acceleration might indicate ***specific activities*** (sleeping versus running versus walking)" [*Id.,* 13:25-27];
- "The calculating logic 150 can further use the data from the processors 115, 125, 135, 145 to classify a ***current user's activity*** from a plurality of predefined identifiable user activities as well as trained user activities." [*Id.,* 14:46-49];

- "In one embodiment, when enough events indicative of a particular ***user social activity*** are detected, the calculating logic 150 identifies the activity as being performed by the user." [*Id.,* 14:54-57];
- "Once the system has identified ***a user activity***, the system may apply a set of motion criteria specific to the identified social state" [*Id.,* 15:4-6];
- "Conversely, where the user is in a ***work related activity***, such as at a conference, the social template could be configured…" [*Id.,* 20:57-59].

The specification does not disclose any embodiments where the activity is not detected or classified, and such embodiments would not be possible, given the claim language and purpose of the invention—to prevent or control interruptions to the current activity. The specification makes clear that to accomplish its purpose, the claimed invention seeks to identify and/or classify what the user is doing. Even what normally might be perceived as inactivity outside of the context of the invention, e.g., sleeping, the specification in the context of the invention views as another type of activity: "For instance, specific patterns of acceleration might indicate ***specific activities*** (***sleeping*** versus running versus walking)" [Ex. C, '522, 13:25-27].

The specification also refers to the "location and duration of the social signature." If the signature were not indicative of an activity, it would not have both a location and a duration. [Ex. C, '522, 16:43.]

Therefore "indicative of a type of activity" is a necessary part of the construction of "social signature," because it "most naturally aligns with the patent's description of the invention [and] will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quotation omitted).

### 2. ArcSoft's Proposed Construction vs. e.Digital's Original Construction

e.Digital's original construction, "raw or processed data and/or other information based on sensors," has already been rejected by Judge Tigar for numerous valid reasons. [Ex. A, Order at 3:19-4:21.]

As to "raw or processed data," Judge Tigar pointed out that "[t]he word 'raw' appears nowhere in the patent." [Ex. A, Order at 4:28-5:1.] "Figure 3 shows unambiguously that data is 'processed' before it becomes part of a social signature." [*Id.* at 4:27-28.]

Further, "raw or processed data" is ambiguous and instead, the patent discloses a "combination" of sensor data. [Ex. A, Order at 4:14-20 ("The essence of the invention is to **combine** information about an individual so that he or she may be appropriately categorized accordingly to a taxonomy set out in the patent." (citing Ex. C, '522, 1:39-40, 3:34-35, 5:46-47, 23:2-35, cl.1; 24:14-57, cl. 8; 25:50-26:15, cl. 17.)]

The reasons why the correct construction should (i) state "sensor data" and not be broadened to "and/or other information based on sensors" and (ii) include "indicative of a type of activity" are already addressed above.

Accordingly, e.Digital's proposed construction is overbroad and confuses the issues rather than help the Court or jury.

### D. "Social hierarchy"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's Construction |
|---|---|---|---|
| Social hierarchy | an arrangement of persons, things, information and/or operations in a series of levels | an arrangement of persons or their representations in a series of ordered levels | an arrangement of persons and/or operations in a series of ordered levels |

### 1. ArcSoft's Construction vs. Judge Tigar's Construction

The only modification ArcSoft seeks to make to Judge Tigar's construction is to replace "persons **and/or operations**" with "persons **or their representations**" to clarify its meaning.

Judge Tigar agreed with Dropcam that a "social hierarchy" cannot contain "things" or "information." [Ex. A, Order at 6:19-21 ("Here, the context is a patent about a 'social hierarchy,' and e.Digital does not explain how the language of the claims supports the notion that a social hierarchy could contain 'things' or 'information.'")]. Judge Tigar included the language "persons and/or operations" to address e.Digital's argument that the social hierarchy could contain "social networking services or microblogs," rather than just people. [*See* Ex. C, '522, 21:4-14 ("Such communication could be through text messages, emails, computer read messages sent to a voice line, and, where social networking service and/or microblog are set up, through networking service and microblog updates.")]. But the word "operations" does not appear in the claims or specification in this sense; it was proposed by e.Digital without any specific counter-proposal by Dropcam. This word is broad and confusing and broadens the claim scope without any meaningful limitations.

"Representations [of persons]" instead of "operations" would achieve the same goal and make the construction clearer to a jury. "Text messages, emails, computer read messages sent to a voice line, and, where social networking service and/or microblog are set up, through networking service and microblog updates" are not "operations" but different modes of communication with people through their technological representations. In other words, if a person is not reached directly, their voicemail or blog is reached as a representation of this person, but with the ultimate goal of reaching the person. Therefore "an arrangement of persons *or their representations* in a series of ordered levels" is a better, more precise construction.

## 2. ArcSoft's Construction vs. e.Digital's Original Construction

Judge Tigar has already explained why e.Digital's proposed construction is wrong. [Ex. A, Order at 6:7-7:23.] e.Digital relied on the American Heritage Dictionary's definition of a hierarchy as "[a]n arrangement of persons *or things* in a

graded series." But as Judge Tigar stated, this dictionary definition cannot be applied to any use of "hierarchy" without considering the context:

> The meaning of a word depends on the context in which it appears. *E.g.,* Silvia P. Gennari, et al., "Context-Dependent Interpretation Of Words: Evidence For Interactive Neural Processes," 35 Neuroimage 1278, 1278 (2007)." ***Here, the context is a patent about a "social hierarchy," and e.Digital does not explain how the language of the claims supports the notion that a social hierarchy could contain "things" or "information."*** The social hierarchy is discussed throughout the claims as containing persons or social networking operations that are to be provided with communication, supporting the use of the modifier "social." Indeed, adoption of e.Digital's construction of "hierarchy" to include "information" or "things" would conflict with the plain and ordinary meaning of the term "social." *See Phillips*, 415 F.3d at 1312 ("the words of a claim are generally given their ordinary and customary meaning") (citation and quotation omitted).

[Ex. A, Order at 6:17-26 (emphasis added).]

The hierarchy must also have ordered, or ranked, levels. As Judge Tigar noted, "e.Digital's own citation to the American Heritage Dictionary shows that hierarchies are typically understood as '***graded***,' consistent with the idea of the levels being ordered or ranked. Nothing in the intrinsic evidence supports abandoning this plain and ordinary meaning of the word hierarchy." [Ex. A, Order at 7:10-13.] Therefore, the construction needs to convey this idea of an order, grading, or ranking, and include Judge Tigar's language "ordered levels."

The rest of the differences with e.Digital's construction are already addressed above.

**E.** **"Social template"**

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|---|---|---|---|
| Social template | 1. Construction e.Digital originally proposed in the present case:<br><br>"parameters and/or information for analysis of social signatures"<br><br>2. Construction to which e.Digital agreed in the Dropcam case but declined to agree in this case:<br><br>"data structure associated with a social hierarchy and one or more social signatures" | data structure associated with a social hierarchy and a social signature | Not construed by Judge Tigar; e.Digital and DropCam agreed to "data structure associated with a social hierarchy and one or more social signatures"<br><br>[*see* Ex. A, Judge Tigar's order at 12] |

**1.** **ArcSoft's Construction vs. e.Digital's Agreed-upon Construction in the Dropcam case**

After the issuance of Judge Tigar's order, ArcSoft and e.Digital discussed whether they can agree on a construction. ArcSoft proposed "data structure associated with a social hierarchy and *a social signature*," and e.Digital countered with "data structure associated with a social hierarchy and *one or more social signatures*"—the construction to which e.Digital and Dropcam agreed in the Dropcam case. The only difference between those two constructions is "a social signature" vs. "one or more social signatures." But inexplicably, e.Digital then refused to adopt this previously agreed-upon construction in the present case and went back to its original proposal.

The claim recites "each **social template** corresponding to *a* unique **social signature.**" The claim language thus supports one unique signature per template; otherwise the signature would not be unique. Although the specification contains

language "social signature or social signatures associated with each social template" [Ex. C, '522, 18:67-19:10], that language does not include the word "unique," as the claim does, and refers to any, non-unique signature. The specification cannot be read into the claim to broaden its meaning; the language of the claim itself must be considered before and above any other claim construction evidence. *Cat Tech.*, 528 F.3d at 884. Because the claim language adds the limitation "unique," it narrows the meaning from just any signature to a specific, one-of-a-kind signature, of which there can be only one. Thus the claims require a one-to-one relationship between each social template and each unique social signature.

ArcSoft's construction is consistent with the goal of the invention. The unique social signature, indicative of a certain activity, determines what social template to use. The template is then used to regulate access to the user or the amount of information shared about the user with the persons in the social hierarchy.

The specification also repeatedly recites "social templates" and "social signatures" in the plural form in parallel: "determines which of the social signatures of the social templates has the greatest correspondence" [Ex. C, '522, 1:40-41] or "[d]etermines which of the social signatures of the social templates has the greatest correspondence with the created social signature." [Ex. C, '522, 3:35-37; 5:47-49.] Because both templates and signatures are in the plural form (as opposed to having the template in the singular, and signatures in the plural form), this also supports the construction under which each of the multiple templates corresponds to only one of the multiple signatures, which is ultimately made explicit in the claim language "each **social template** corresponding to *a* unique **social signature.**"

### 2. ArcSoft's Construction vs. e.Digital's Original Construction

e.Digital's construction, "parameters and/or information for analysis of social signatures," is broad, amorphous, and will be unhelpful to the jury. Both the claims and the specification describe a social template as not a vague set of "parameters and/or information," but as a structure with a social signature and a social hierarchy.

For example, claim 1 of the '522 patent recites:

a memory which stores social templates, ***each social template corresponding to a unique social signature*** comprising a first sensor value range and a second sensor value range other than the first sensor value range and each social template being selectable to provide, for each level of the predetermined social hierarchy, a corresponding differing amount of information to each member of the predetermined social hierarchy; and

a server comprising a processor which receives the sensor data from the communication device, creates a detected social signature from the received sensor data, determines ***which of the social signatures of the stored social templates*** has a greatest correspondence with the created social signature through comparison of the first and second detected sensor values and the first and second sensor value ranges of each stored social template, retrieves from the memory the determined one social template having the greatest correspondence and having the detected amount of light within the first sensor value range and the detected sound level within the second sensor value range, and provides to at least one member of the predetermined social hierarchy only as much information as allowed based on the retrieved social template.

Similarly, the specification provides tables to describe the social template. These tables are part of an organized data structure which has specific information: social signature and a social hierarchy:

TABLE 1

| do-not-disturb-due-to-Mother-and-baby-sleeping social signature | |
| --- | --- |
| Sensor | Value range |
| Location | 39.78° N, 104.88° W ±5 m |
| Inertial | 0 m/s$^2$ ± .2 m/s$^2$ |
| Optical | 223 lm ± 15 lm |
| Acoustic | −63 db ± 5 db |

## TABLE 2

**do-not-disturb-due-to-Mother-and-baby-sleeping social hierarchy**

| Social Hierarchy | Information |
| --- | --- |
| First Social Hierarchy Level-Father | Provide information on location, duration of state, and |

## TABLE 2-continued

**do-not-disturb-due-to-Mother-and-baby-sleeping social hierarchy**

| Social Hierarchy | Information |
| --- | --- |
| | estimate of baby sleep time |
| Second Social Hierarchy Level-Friend | Provide information on baby sleeping |
| Third Social Hierarchy Level-School, Work | Do not disturb except in emergency |
| Fourth Social Hierarchy Level-Strangers | Do not disturb |

Thus a social template is not just a set of parameters but a data structure that contains certain information in an organized way.

Further, a social template is not used "for analysis of social signatures." As the claims state and the tables show, the template contains a social signature or is at least associated with a social signature. In other words, the social signature is part of the template.

The rest of the differences with e.Digital's original construction are addressed above.

## V. CONCLUSION

Accordingly, e.Digital's constructions are overbroad and vague, and the Court should adopt ArcSoft's constructions.

Dated: December 7, 2015

FISH & RICHARDSON P.C.

By: /s/ Christopher S. Marchese
Christopher S. Marchese
marchese@fr.com

Attorneys for Defendant, ArcSoft, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 7, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

/s/ Christopher S. Marchese
Christopher S. Marchese
marchese@fr.com