1  Christopher S. Marchese (SBN 170239) marchese@fr.com
2  Olga May (SBN 232012) omay@fr.com
   FISH & RICHARDSON P.C.
3  12390 El Camino Real
   San Diego, CA 92130
4  Telephone: (858) 678-5070
   Facsimile:  (858) 678-5099
5
6
   Roger Borovoy (SBN 31209) borovoy@fr.com
7  FISH & RICHARDSON P.C.
   500 Arguello Street, Suite 500
8  Redwood City, CA 94063
9  Telephone:  (650) 839-5021
   Facsimile:   (650) 839-5071
10
11 Attorneys for Defendant ArcSoft, Inc.

12              UNITED STATES DISTRICT COURT

13             SOUTHERN DISTRICT OF CALIFORNIA

14 e.Digital Corporation,              Case No. CV-15-0056 BEN (DHB)

15              Plaintiff,             **DEFENDANT ARCSOFT, INC.'S**
                                       **RESPONSIVE CLAIM**
16       v.                            **CONSTRUCTION BRIEF**

17                                     Date:   January 21, 2016
   ArcSoft, Inc., dba as Closeli and as  Time:  9:30 a.m.
18 simplicam,                          Courtroom:  5A, Schwartz Bldg.

19              Defendant.             Hon. Roger T. Benitez
20
21
22
23
24
25
26
27
28

                                       Case No. CV-15-0056 BEN (DHB)

# **Table of Contents**

Page(s)

I.    Introduction ...................................................................................... 1

II.   Argument .......................................................................................... 2

    A.   "First detected sensor value/"second detected sensor value" ...................................................................................... 2

        1.   "light/acoustic measurements" .................................... 2

        2.   "one of multiple possible… measurements between a high and low value" ...................................... 9

    B.   "social signature" ................................................................. 13

        1.   "combination" .............................................................. 14

        2.   "indicative of a type of activity" ............................... 15

        3.   e.Digital fails to provide any support for its proposed construction of "raw or processed data and/or other information based on sensors" ....................... 17

    C.   "social hierarchy" ................................................................ 19

        1.   "persons or their representations" ............................. 19

        2.   "a series of ordered levels" ....................................... 21

    D.   "social template" ................................................................. 22

        1.   parameters and/or information ................................. 23

        2.   a social signature ....................................................... 24

III.  Conclusion ..................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003) .................................................................3, 6, 10

*Comark Communs. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) .................................................................2, 4, 15

*Creative Integrated Sys. v. Nintendo of Am., Inc.*,
   526 Fed. Appx. 927 (Fed. Cir. 2013)................................................................4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) ......................................................................15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) ....................................................................9, 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................*passim*

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................2

# I.    INTRODUCTION

e.Digital's proposed constructions are overbroad and seek to expand the scope of its patents to security camera products not covered by the asserted patents. e.Digital's constructions lack support in the claim language, specification, and even the extrinsic dictionary definitions on which e.Digital relies, and should therefore be rejected.

Faced with lack of support for its constructions in any of the five asserted patents, e.Digital resorts to relying on two other patents that are not even before this Court: 'the 331 and '983 patents. Although these two later-issued patents share the same specification with the asserted patents, the '331 and '983 ***claims*** differ from the asserted claims in ways that make the former irrelevant to the claim construction disputes before the Court. In these non-asserted patents, e.Digital has modified the claims and now argues that these modified claims should act to broaden the claims at issue here. Notably, e.Digital does not rely on the shared specification, but picks out the '331 and '983 claim language that is different from the claim language of the asserted patents. That is not consistent with the law of claim construction—claims with materially different language in related patents cannot be used to broaden the scope of claims in the asserted patents. The '331 and '983 patents are not instructive or relevant to the construction of the currently disputed terms, and the Court should reject e.Digital's invitation to vary the scope of the asserted claims.

In contrast, ArcSoft proposes constructions that remain true to the overall scope of the claims and elucidate terms that may otherwise prove difficult for the jury to understand. ArcSoft's proposed constructions, moreover, are consistent with the explanations of the purported invention presented in the specification and prosecution histories. They also follow Judge Tigar's issued constructions and constructions to which e.Digital agreed in the Dropcam case. Therefore, ArcSoft's constructions most naturally align with the scope of the claims and should be adopted.

## II. ARGUMENT

### A. "first detected sensor value"/"second detected sensor value"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|---|---|---|---|
| First detected sensor value | plain and ordinary meaning | one of multiple possible light measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |
| Second detected sensor value | plain and ordinary meaning | one of multiple possible acoustic measurements between a high and low value used to develop a social signature | Not construed by Judge Tigar |

In the discussion below, ArcSoft addresses specific issues e.Digital raised with ArcSoft's proposed constructions.

#### 1. "light/acoustic measurements"

e.Digital's argument that "first/second detected sensor value" can refer to "any sensor" and thus any measurement, as opposed to a light or sound sensor, contradicts the primary claim construction evidence—claim language. The claims of the asserted patents specify two particular types of sensors whose data value is at issue: light and sound. In a theme that permeates its briefing, e.Digital now attempts to broaden these terms in a way that ignores the remainder of the claim language and attempts to capture claim scope that is inconsistent with the overall import of the asserted claims.

As e.Digital acknowledges, "in determining the proper construction of a claim, a court should first look to the language of the claims." [e.Digital's Br. at 3:22-27 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)).] "[T]he claims themselves provide substantial guidance as to the meaning of particular claim

terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (citing *Vitronics*, 90 F.3d at 1582). "The context of the ***surrounding words of the claim*** also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (emphasis added). It is this holistic approach to claim construction that e.Digital would have the Court ignore, instead construing the currently asserted claims in light of claim terminology from other, non-asserted patents, and without reference to the surrounding words of the claim.

The claim language at issue makes clear that "first/second values" are measurements of particular subject matter: light or sound. The claims are explicit on this point. For example, representative claim 1 of the '522 patent recites:

> 1. A system to automatically provide differing levels of information according to a predetermined social hierarchy, the system comprising:
> a communication device comprising a sensor set which detects sensor data comprising a **first detected sensor value** <u>comprising an amount of light</u> of the environment of the communication device from an optical sensor and a **second detected sensor value** <u>comprising a sound level</u> of the environment of the communication device from an acoustic sensor, and transmits the sensor data…

This is true of each claim (asserted or unasserted) of each of the five asserted patents. For this reason, e.Digital's brief does not cite to a single claim of the five asserted patents where the first/second detected sensor values would ***not*** be a measurement of a light/sound sensor. [Ex. C[1], '522, independent claims 1, 8, 17 (requiring at least a light sensor and a sound sensor); Ex. B, '514, indep. claims 1, 5, 10, 14, 21, 26, 30, 34, 36 (same); Ex. D, '523, indep. claims 1, 19 (same); Ex. E, '524, indep. claim 1 (same); and Ex. F, '619, indep. claims 1, 19 (same).] The dependent

_____

[1] Except as noted otherwise, all citations to exhibits are to the exhibits attached to the Declaration of Christopher S. Marchese in Support of ArcSoft's Opening Brief, D.I. 47-1.

claims, of course, incorporate the same "first/second values" limitations. None of the dependent claims use the term "first/second values" to refer to any other measurements.

In fact, e.Digital directly "***concedes*** that claim 1 of the '522 patent, for example, discloses:

> 'a communication device comprising a sensor set which detects sensor data comprising a first detected sensor value comprising an amount of light of the environment of the communication device from an optical sensor and a second detected sensor value comprising a sound level of the environment of the communication device from an acoustic sensor. (Exhibit A ('522 patent), claim 1.)' "

[e.Digital's Br. at 14:22-26 (emphasis added).]

Unable to justify its position when faced with the "light/sound" sensor present in each claim of each asserted patent, e.Digital attempts to rely on the claim language of two other patents—the '331 and '983—that are not asserted in this case (and were not asserted in the Dropcam case). These patents are of no help to e.Digital.

First, the claims of the '331 and '983 patents are significantly different in language and in scope from the asserted patents and thus require different construction. "The doctrine of claim differentiation create[s] a presumption that each claim in a patent has a different scope." *Comark Commc'ns*, 156 F.3d at 1186. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *Id.* (*citing Tandon Corp. v. United States ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). The doctrine can be applied to differentiating between any claims, including two independent claims, when necessary to prevent "render[ing] superfluous the exacting language chosen by the patentee." *Creative Integrated Sys. v. Nintendo of Am., Inc.*, 526 Fed. Appx. 927, 935 (Fed. Cir. 2013) (differentiating

two independent claims: unasserted claim 1, which "concisely and unambiguously describes a block that contains contacts on each end which are connected to each other by metallization lines—in other words, a block limited to the figure 7 embodiment" from claim 5, which "requires only that the 'plurality of blocks [are] coupled together at their ends by metallization lines'" and thus is not limited to the figure 7 embodiment).

Here, the difference is all the greater, because e.Digital attempts to rely not just on different claims of the same patent, but on the claims of *different patents*. Although they use the general terms "sensor" and "sensor data," the '331 and '983 patents do not recite the "additional language" of light or sound sensors. Nor do the '331 and '983 patents use the terms "first value" and "second value," which require at least two sensors.

For example, representative claim 1 of the '331 patent recites:

1. A method for transmitting data comprising:
generating *sensor data* representing a characteristic of a user's activity;
…
creating a social signature based on the generated *sensor data* ….

[D.I. 46-8, e.Digital Ex. G.]

As another example, representative claim 1 of the '983 patent recites:

1. A system for automatically performing operations according to a social hierarchy, the system comprising:
a) a communication device having *at least one sensor* for generating *sensor data* representing a characteristic of the user's activity in the environment of the communication device;
…

c) calculating logic comprising code to:
      i) create a social signature based on the *sensor data* ….

[D.I. 46-9, e.Digital Ex. H.]

Thus the '331 and '983 claims contain critical differences in language and scope and are not instructive.

Even if they shared the same claim language, which they don't, the '331 and '983 patents are irrelevant because they are not asserted and are outside of the issues presented for claim construction to this Court. Construing additional patents will only create confusion and result in an advisory opinion without asserted jurisdiction. These non-asserted patents are a red-herring for the present claim construction and are proffered to obfuscate the clear import of the claim language, which states that the first and second sensors are for light and sound, respectively. In construing these terms, the Court should remain true to the surrounding claim language, and interpret these terms to include the measurements required by the surrounding claim language: light and sound. *See ACTV,* 346 F.3d at 1088 ("The context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

Further, the prosecution histories also show that the language "specific sensors of optical and acoustic measurements" was critical to the scope of the claims. For example, during the prosecution of the '522 patent, as of April 27, 2012, the claims recited sensors, "a first/detected sensor value" and "first/second sensor value ranges" without specifying that the sensors or values were light and sound:

IN THE CLAIMS:

Please **AMEND** claims 1, 4, 19, 23 and 58 in accordance with the following:

1.      (CURRENTLY AMENDED)    A system to automatically provide differing levels of information according to a predetermined social hierarchy, the system comprising:

a communication device comprising a sensor set which detects sensor data including first detected sensor value from a first sensor and a second detected sensor value from a second sensor related to an environment of the communication device, and transmits the sensor data;

a memory which stores social templates, each social template corresponding to a unique social signature comprising a first sensor value range and a second sensor value range other than the first sensor value range and each social template being selectable to provide, for each level of the predetermined social hierarchy, a corresponding differing amount of information to each member of the predetermined social hierarchy; and

a server comprising a processor which receives the sensor data from the communication device, creates a detected social signature from the received sensor data, determines which of the social signatures of the stored social templates has a greatest correspondence with the created social signature through comparison of the first and second detected sensor values and the first and second sensor value ranges of each stored social template, retrieves from the memory the determined one social template having the greatest correspondence, and provides to at least one member of the predetermined social hierarchy only as much information as allowed under the social hierarchy as defined in the retrieved social template.

[Ex. H, '522 prosecution history at pp. 106-115 (April 27, 2012 amendment by applicant).][2]

---

[2] *See also* Ex. H, '522 prosecution history at pp. 106-115 (April 27, 2012 amendment by applicant); Ex. I, '523 prosecution history (USPTO Proceeding No. 13/047,290) at p. 143 (examiner's summary of Aug. 23, 2012 interview), pp. 134-141 (applicant's Sep. 17, 2012 statement of the Aug. 15 and 23, 2012 discussions with examiner), pp. 119-133 (May 11, 2012 amendment by applicant); Ex. J, '524 prosecution history (USPTO Proceeding No. 13/047,306) at p. 161 (examiner's summary of Aug. 23, 2012 interview), pp. 144-154 (May 16, 2012 amendment by applicant), pp. 155-159

On August 22, 2012, the examiner conducted an interview with the applicant to discuss certain prior art that prevented the application from issuing as a patent. [Ex. H at 117.] The examiner suggested that the applicant amend the claims in the application to specify that the sensors were optical and acoustic:

> Examiner suggesting the adding of the ***specific sensors of optical and acoustic measurements*** and ranges and the comparison done to the received sensor measurement to determine the social template to which the limited amount of information is to be disclosed within the social hierarchy.

[Ex. H, '522 prosecution history at pp. 117 (examiner's summary of Aug. 22, 2012 interview); *see also* footnote 2, *supra*.] Only after that did the patents issue. Because the additional language specifying light and sound sensors was critical to the issuance of the claims, it should be included in the construction of "first/second detected values" to convey the proper meaning of the issued claims.

In sum, based on the claim language, "first/second detected sensor values" means, as ArcSoft proposes, "one of multiple possible light/acoustic measurements between a high and low value used to develop a social signature." In fact, e.Digital's argument boils down not to arguing with the meaning of the proposed construction, but to seeking a broader construction, which would not include "light/acoustic." e.Digital argues that the claim already recites "comprising an amount of light/sound level." [e.Digital Br. at 15:2-9.] In essence, e.Digital argues that including "light/acoustic" is unnecessary and potentially redundant. The purpose of ArcSoft's construction is to spell out the meaning of the term for the Court and jury to avoid any doubt or ambiguity during infringement analysis. Therefore ArcSoft's proposed construction is proper as is. But to remove any reason for e.Digital's objection based

---

(applicant's Aug. 31, 2012 statement of Aug. 13, 15, and 23, 2012 discussions with examiner); Ex. K, '514 prosecution history (USPTO Proceeding No. 13/047,206) at p. 191 (examiner's summary of Aug. 22, 2012 interview), pp. 162-175 (April 27, 2012 amendment by applicant), pp. 176-189 (applicant's statement of Aug. 13, 15, and 23, 2012 discussions with examiner).

on any perceived redundancy, instead of construing just the language "first/second detected sensor value," ArcSoft would be amenable to the Court construing the entire phrase "a first/second detected sensor value <u>comprising an amount of light/sound level</u>" as proposed by ArcSoft. This will eliminate even a potential redundancy.

In contrast to ArcSoft's proposed clarifying construction, e.Digital's proposal of "plain meaning" will add no clarity and may only create confusion later. The "purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro*, 521 F.3d. at 1361. Accordingly, the Court should adopt ArcSoft's construction.

## 2. "one of multiple possible… measurements between a high and low value"

First, the parties agreed to Judge Tigar's construction of a related term—"sensor value range"—as "range of measurements between two values." [D.I. 45; Ex. A, Order at 2:1-2.] ArcSoft's construction of "first detected sensor value"/"second detected sensor value" naturally flows from Judge Tigar's construction of "sensor value range."

The close relation between the terms is shown in claim language taken from claim 1 of the '522 patent. The claim has three elements, and the progression of the claim makes it clear that the "first/second detected sensor values" are inextricably tied to the "first/second sensor value ranges" and must be construed consistently:

- Element 1: A "communication device" comprising a sensor set that detects sensor data including "*a first detected sensor value* comprising an *amount of light* of the environment" and "*a second detected sensor value* comprising a sound level of the environment."

- Element 2: A "memory" that stores social templates each of which corresponds to a unique social signature comprising a "***first sensor value range***" and a "***second sensor value range***."
- Element 3: A "server" that, among other functions, determines the social signature of the social template with "greatest correspondence" to the detected social signature "***through comparison of the first and second detected sensor values and the first and second sensor value ranges***." This element further provides that the determined social template has "the ***detected amount of light*** within the ***first*** sensor value ***range*** and the ***detected sound level*** within the ***second*** sensor value ***range***."

[Ex. C, '522 patent claim 1 (emphasis added).] This claim language—considered as a whole, as it must be—ties the first/second sensor values to the first/second sensor value ranges. *See ACTV,* 346 F.3d at 1088 ("The context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."). Indeed, the claim requires a "***comparison***" between the "values" and their respective "ranges," and expressly states that the detected light and detected sound levels are "***within***" the respective ranges. Because a range of values is a range of measurements, each value is necessarily "one of multiple possible [light/acoustic] measurements" within that range.

e.Digital's proposed "plain meaning" construction ignores the totality of the claim and will not "determin[e] the meaning and scope of the patent claims" and accomplish the purpose of claim construction. *O2 Micro*, 521 F.3d at 1360. Accordingly, the Court should adopt ArcSoft's construction.

ArcSoft's proposal that these terms refer to "measurements" is also compelled by the claim language itself: "a first detected sensor value comprising ***an amount*** of light" and "a second detected sensor value comprising a sound ***level***." *See Phillips*, 415 F.3d at 1314 ("the claims of a patent define the invention," are "of primary importance," and "provide substantial guidance as to the meaning of particular claim terms"). "An amount" and "a level" are concrete measurements of light and sound.

The specification further confirms this construction. The specification contains abundant support showing that the sensors sense data in measurements, for example:

"In the shown mobile device 100, additional user social statistics sensors are *measured* using the optical sensor 130 and the acoustic sensor 140." [Ex. C, '522, 9:29-32; *see also* '522, 41-43, 51-54, 11:16-18; 11:19-29; 12:64-13:7; 13:23-26; 13:31-36; 13:48-51; 9:24-34.] The specification also gives examples of specific numeric measurements for light and sound values: "the optical sensor 130 senses a light value of 223 lm, and the acoustic sensor 140 senses a sound level of -63 db." [Ex. C, '522, 16:16-18; *see also* Table 1 (listing specific value ranges for a sensor on a "plus/minus" basis); 13:65-67, 14:1-3, 15:4-9, 16:14-23, 17:66-67, 18:1-13, 19:20-33, 19:51-58.] The '522 specification thus describes not simply a general idea of measurement, but using specific granular measurements taken among multiple possible measurements within potentially broad data ranges. [*Id.*]

The prosecution histories of the asserted patents also show that the claims covered specific measurements. As discussed above, the examiner suggested adding specific optical and acoustic sensors and with them, optical and acoustic measurements and ranges:

> Examiner suggesting the adding of the ***specific sensors of optical and acoustic measurements and ranges*** and the comparison done to the received ***sensor measurement*** to determine the social template to which the limited amount of information is to be disclosed within the social hierarchy.

[Ex. H, '522 prosecution history at pp. 117 (examiner's summary of Aug. 22, 2012 interview); *see also* footnote 2, *supra.*]

Second, because the sensor value range has been construed to be "between two values," each value within it is necessarily a measurement "between a high and low value." The '522 specification lists examples of such high and low values in Table 1 on a mathematical plus/minus basis, with the minus end being the low, and the plus end being the high, value.

TABLE 1

| do-not-disturb-due-to-Mother-and-baby-sleeping social signature | |
| --- | --- |
| Sensor | Value range |
| Location | 39.78° N, 104.88° W |
| | ±5 m |
| Inertial | 0 m/s$^2$ ± .2 m/s$^2$ |
| Optical | 223 lm ± 15 lm |
| Acoustic | −63 db ± 5 db |

e.Digital's argument that a high and low value are not required is disingenuous, particularly after e.Digital already agreed to the construction of sensor value range as "range of measurements ***between two values***." [D.I. 45.] The values at issue are specific—light and sound. Maps, street coordinates or color scales are not at issue. Light and sound value ranges, as shown in the above Table 1, have numeric low and high values at each end of the range.

Even assuming that ranges of data such as street coordinates or color scale were at issue, such ranges would also necessarily have to be defined by specific values—i.e., high and low values. These high and low values are necessary to mark the boundaries of the "sensor value range," which e.Digital agrees is a "range of measurements between two values." This is readily shown by Table 1, for example, with respect to the location value range. It specifies the location high and low values in granular measurements, down to fractions: 39.78° N, 104.88° W, ±5m. This precision in measurements is a necessity for an invention that claims to have the ability to pinpoint the location of the user in a particular room in the house, such as a nursery, so that the user's activity can be identified as accurately as possible. [Ex. C, '522, 15:32-33.]

Although e.Digital tries to obscure the concepts of range and value of sensor data to include "availability" [e.Digital Br. at 16:11], nowhere in the specification

does it imply that availability is a "value" of data or part of a data range as used in the claim. In fact, availability is a conclusion based on the detected data, but it is not detected data or a value of data itself: "this usage *data may be detected* by the calculating logic 150 and/or input device as a sensor *and indicate that the user is available* for certain types of calls." [Ex. C, '522, 10:62-65.] Availability is thus part of the social signature created based on the sensor data: "[e]xamples of hierarchical social classification that can be identified include high level available, busy, do not disturb." [Ex. C, '522, 14:34-36; *see also* 16:51-53.] In any case, availability or any other data that cannot be part of a range with a high and low value is simply not within the meaning of the claims that require a specific "value" and a "range of measurements between two values," and thus cannot be used as part of the term construction.

Finally, e.Digital does not dispute that the value is used to develop a social signature. [*See, e.g.,* Ex. C, '522, Table 1 (listing values under the range for the specific signature in the table).]

## B. "social signature"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's Construction |
|------|-----------------------------------|----------------------------------|----------------------------|
| Social signature | raw or processed data and/or other information based on sensors | a combination of processed sensor data indicative of a type of activity | a combination of processed sensor data and/or other information based on sensors |

As an initial matter, e.Digital's brief mis-states the construction it proposed to ArcSoft. It was not, as e.Digital states, "data and/or other information based on sensors," but "raw or processed data and/or other information based on sensors." Regardless, neither of e.Digital's proposals is supported.

e.Digital disagrees with two aspects of ArcSoft's proposed construction: "combination" and "indicative of a type of activity."

### 1. "combination"

Tellingly, e.Digital's entire argument against the use of the word "combination" is again premised on the claim language of the two patents—the '331 and '983—that are different in scope, do not require a combination, and thus are not instructive.

As explained above, claim terms must be construed in the context of the claim. *Phillips*, 415 F.3d at 1314. The claims of the asserted patents require combining data from at least two different sensors: a light sensor and a sound sensor. [*See* Ex. C, '522, 1, 8, 17; Ex. B, '514, claims 1, 5, 10, 14, 21, 26, 30, 34, 36 (requiring at least a light sensor and a sound sensor); Ex. D, '523, claims 1, 19 (same); Ex. E, '524, claim 1 (same); and '619, claims 1, 19 (same).]

Judge Tigar already explained that the claims of the asserted patents affirmatively require the combining of sensor data:

> Second, Dropcam argues (and e.Digital does not seriously dispute) that the social signature must be based on a "combination" of such data. The essence of the invention is to combine information about an individual so that he or she may be appropriately categorized accordingly to a taxonomy set out in the patent. The phrase "creates a detected social signature from the received sensor data" appears three times in the specification, ECF No. 50-2 ('522 Patent) at 1:39-40, 3:34-35, 5:46-47, and all three of the independent claims on which the remaining claims depend ***affirmatively require the combining of sensor data*** as part of constructing a social signature. *Id*. at 23:2-35, cl.1; 24:14-57, cl. 8; 25:50-26:15, cl. 17. Accordingly, the Court will adopt a construction that uses the word "combination."

[Ex. A, Order at 4:13-21 (emphasis added).]

In contrast, the claims of the '331 and '983 do not affirmatively require such combining. In fact, claim 1 of the '331 patent is neutral in this respect and provides no support for e.Digital's position. Claim 1 simply references "generating ***sensor***

*data*" and "creating a social signature based on the generated ***sensor data***" without limiting this data to one sensor.  Claim 1 of the '983 patent references "having ***at least one sensor*** for generating sensor data representing a characteristic of the user's activity in the environment of the communication device."  Neither limitation comes close to the language of the asserted patent claims reciting "sensor data comprising a first detected sensor value comprising an amount of light of the environment of the communication device from ***an optical sensor*** **and** a second detected sensor value comprising a sound level of the environment of the communication device from ***an acoustic sensor.***"  [Ex. C, '522, claim 1.]  Different language results in presumptively different claim scope and lack of any relevance of the '331 and '983 patents to this claim construction.  *See, e.g., Comark Commc'ns*, 156 F.3d at 1186 (differentiating claims to avoid rendering different language superfluous); *Creative Integrated*, 526 Fed. Appx. at 935 (same).

Accordingly, because the claims of the asserted patents require that sensor data be combined, the proper construction of "social signature" for the asserted patents is "a ***combination*** of processed sensor data and/or other information based on sensors."

## 2.    "indicative of a type of activity"

The specification makes clear that "*[e]ach social signature is indicative of a different type of activity*," which alone should dispose of this construction.  [Ex. C, '522, 15:29-30.]  The specification repeatedly and consistently describes the invention as indicating or classifying the user's activity.  [Ex. C, '522, 1:7-9, 1:15-18, 8:60-62; Fig. 3, 9:5-6, 9:11-13, 9:15-17, 13:25-27, 14:46-49, 14:54-57, 15:4-6, 20:57-59.]  This consistency proves that "indicative of a type of activity" is a necessary part of the construction.  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (where the specification repeatedly and consistently described the local and remote systems of the claimed inventions as communicating directly over a telephone line, the court construed "sending," "transmitting," and "receiving" to require that the data packets travel over a telephone line and not a packet-switched network).  This

construction "most naturally aligns with the patent's description of the invention [and] will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quotation omitted).

ArcSoft set forth detailed support demonstrating that a social signature is always indicative of a type of activity in its opening brief. ArcSoft will not repeat all of that support here but will instead address e.Digital's arguments.

e.Digital argues that the social signature "may suggest that there is no activity" or that it "may simply suggest a map location, the availability of a user, an unusually high heart rate, that a device is not being used, that a device is outside, or that a room surrounding the communication device is empty. These examples suggest, at best, a status, but none are necessarily indicative of an 'activity.'" [e.Digital's Br. at 8:14-25, citing '522 patent at 9:59-65; 10:59-65; 11:66-12:2; 12:48-13:21; 13:46-58.).]

But in the context of these patents, all of these examples are indicative of an activity, ***including inaction***. A person who is at rest (and could outside of the context of these patents be considered inactive) is engaged in a type of activity—rest. For example, the specification treats ***sleep***, which may normally be considered as absence of activity, as a type of ***activity***. [Ex. C, '522, 13:27-28.] If "the motion signature is static," i.e., the user seemingly is not engaged in any activity, "the social signature is that of the mobile phone user and baby napping." Similarly, the location (nursery), optical (dim light), and acoustic (rhythmic breathing) information may signify a napping signature. [Ex. C, '522, 15:31-36.] Thus inaction is an indicator of a certain social signature.

The sensor data described in e.Digital's examples, including map location, availability of a user, heart rate, that a device is not being used, that a device is outside, or that a room surrounding the communication device is empty, is used in the same way to determine and classify the activity, including based on inaction. As e.Digital cannot help admitting, this data indicates the user's "status," which is another way to describe any activity the user may be engaged in. For example:

The touch screen is a capacitive interface, and therefore if there is no capacitive reading, it might indicate that the mobile device 100 is not exposed or being held (example, in a backpack or drawer). In contrast, if the capacitive reading is low, the level might indicate that the mobile device 100 is in a pocket or being held. Similarly, at other capacitive readings, this would be indicative that the user *is actively using* the mobile device 100. The level of the capacitive reading would therefore be usable in the social signature in aspects of the invention.

[Ex. C, '522, 9:61-10:3.] Thus, if the device is not exposed or held, indicating that the device may be in a backpack, particularly when coupled, as necessary, with other sensor data, for example motion and location, could indicate that the user is traveling or resting.

Simply put, an invention that the specification describes as related to "automatically determining if an incoming communication is interruptive, and more particularly to the classification of a person's current actions such that selected callers can automatically or manually gauge the intrusiveness of a communication request," would not be able to accomplish its purpose without having the social signature indicate the type of activity. [Ex. C, '522, 1:7-11.]

### 3. e.Digital fails to provide any support for its proposed construction of "raw or processed data and/or other information based on sensors"

e.Digital's original construction, "raw or processed data and/or other information based on sensors," has already been rejected by Judge Tigar for numerous valid reasons. [Ex. A, Order at 3:19-4:21.]

As to "raw or processed data," as Judge Tigar pointed out, "[t]he word 'raw' appears nowhere in the patent." [Ex. A, Order at 4:28-5:1.] "Figure 3 shows unambiguously that data is 'processed' before it becomes part of a social signature." [*Id.* at 4:27-28.] Figure 3 sets forth an entire sequence of steps for processing the data and sending formatted data to a server:



**FIG. 3**

Start

Sample Sensor Processors — 300

Format data samples — 305

Send formatted data to server — 310

Apply general and trained templates — 315

Make apriori classification — 320

Determine classification error — 325

Update classification error weighting/create new template — 335

training update? — 330

Y

N

Communication request? — 340

N

Y

Determine reporting level — 345

Report information to requestor according to current social classification in selected template — 350

As explained above, the claims also require a "combination" of sensor data, which would require processing it into a combination.

Finally, ArcSoft disagrees that the terms "detected social signature," "created social signature," and "constructed social signature" can be used interchangeably. As shown by the qualifiers, each of these types of signature needs to be detected, created, or constructed, and may or may not be associated with an existing social template.

e.Digital's proposed construction with "raw or processed data" is vague, overbroad, and unsupported by the claims or specification. Accordingly, it should be rejected.

### C.     "social hierarchy"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's Construction |
|------|-----------------------------------|----------------------------------|-----------------------------|
| Social hierarchy | an arrangement of persons, things, information and/or operations in a series of levels | an arrangement of persons or their representations in a series of ordered levels | an arrangement of persons and/or operations in a series of ordered levels |

#### 1.     "persons or their representations"

The claimed social hierarchy consists of persons and cannot consist of "things." As Judge Tigar already explained, e.Digital's proposed construction that includes "things" goes contrary to the nature of the claimed invention—a "*social* hierarchy" that regulates contact with members of *society*, who are people, not things. [*See* Order at 6-7, particularly 6:24-26: "Indeed, adoption of e.Digital's construction of "hierarchy" to include "information" or "things" would conflict with the plain and ordinary meaning of the term "social." *See Phillips*, 415 F.3d at 1312 ("the words of a claim are generally given their ordinary and customary meaning") (citation and quotation omitted).]

Although e.Digital tries to argue for inclusion of "things," its very argument reveals that a "social hierarchy" includes only persons:

> The specifications of the Asserted Patents explain that a "social hierarchy" can include not only persons, but also the quantity, and type of delivery, of information made available to different persons. For example, the specifications describe an "emergency" embodiment, wherein members of the various levels of the social hierarchy receive information through different operations:
>
> > "By way of example, the social template could be designated for emergency situations, and automatically provide information *to the police, fire department, family and/or friends*. Such communication could be through text messages, emails, computer read messages

sent to a voice line, and, where social networking service and/or
microblog are set up, through networking service and microblog
updates. In this way, the device 100, 200 would be able to summon
help in an emergency situation according to a status sensed from the
various device sensors 110, 120, 130, 140."

[e.Digital's Br. at 11:10-20 (citing '522 at 21:4-14).]

The above-quoted portion of the specification makes clear that it is people who
make up the hierarchy *to whom* the information is provided (*to* the police, fire
department, family and/or friends"); and things or operations are *how* this information
is provided, i.e., a mere mode of delivery ("*through* text messages, emails, computer
read messages sent to a voice line, and, where social networking service and/or
microblog are set up, through networking service and microblog updates.").

The other word advanced by e.Digital—"operations"—is equally unavailing.
That word does not even appear in the specification in any sense related to the social
hierarchy, is confusing, and again does not represent persons.

"Representations [of persons]" proposed by ArcSoft, instead of "operations"
proposed by e.Digital, would make the construction clearer to a jury. "Text messages,
emails, computer read messages sent to a voice line, and, where social networking
service and/or microblog are set up, through networking service and microblog
updates" are not "operations" but technological representations of people. In other
words, if a person is not reached directly, their voicemail or blog may be reached as
a representation of this person, but with the ultimate goal of reaching the person.
Therefore "an arrangement of persons *or their representations* in a series of ordered
levels" more naturally aligns with the claimed invention's goal of regulating social
interaction among people.

To the extent e.Digital argues that "or their representations" proposed by
ArcSoft is confusing, in the spirit of compromise, ArcSoft is willing to drop "or their

representations," leaving only "persons."  Because "social hierarchy" focuses on the persons, only "persons" is necessary to convey the meaning of this term.

### 2. "a series of ordered levels"

A hierarchy presupposes a ranking, a grading, or an ordering.  The applicant could have used any word but chose the word "hierarchy," which connotes an order.

e.Digital's opposition to "ordered" is belied by the dictionary definition of "hierarchy" on which e.Digital relies:  "An arrangement of persons or things in a graded series."  [D.I. 46-13, e. Digital Ex. L.]  Judge Tigar already pointed this out:

> But e.Digital's own citation to the American Heritage Dictionary shows that hierarchies are typically understood as "graded," consistent with the idea of the levels being ordered or ranked. Nothing in the intrinsic evidence supports abandoning this plain and ordinary meaning of the word hierarchy.

[Order at 7:4-13.]

The specification makes clear that the hierarchy orders, or ranks, how access to the user is allowed and information about the user is shared.  For example, if the signature is do-not-disturb-due-to-Mother-and-baby-sleeping:

- the Father is assigned a "*First Social Hierarchy Level*" and receives "a high level of information,"

- a neighbor us assigned "a *Second Social Hierarchy Level* and less information is to be provided,"

- someone from the office is assigned "the *Third Social Hierarchy Level* and even less information is to be provided," and

- a stranger is assigned "*Fourth Social Hierarchy Level* and indicate only that the caller is not to be disturbed."  [Ex. C, '522, 16:26-64.]

Thus the specification even goes so far as to number the levels in the hierarchy in an order as first, second, third, and fourth—in other words, as ordered levels.

The language e.Digital quotes from the non-asserted '331 patent sheds no light on the meaning of the term:

"a) a first set of one or more operations to be performed ***using a first data*** for a first set of target devices within a first social level, and [¶]
b) a second set of one or more operations, ***different from the first set of one or more operations*** to be performed ***using a second data*** for a second set of target devices within a second social level."

[e.Digital's Br. at 12, citing '331, claim 1.]  This quote simply shows that information provided to different ordered levels in the hierarchy is different.  *See, e.g., Comark Commc'ns*, 156 F.3d at 1186; *Creative Integrated*, 526 Fed. Appx. at 935.

Accordingly, "social hierarchy" should be construed as "an arrangement of persons or their representations in a series of ordered levels."

### D. "social template"

| Term | e.Digital's Proposed Construction | ArcSoft's Proposed Construction | Judge Tigar's construction |
|------|-----------------------------------|--------------------------------|----------------------------|
| Social template | 1. Construction e.Digital originally proposed in the present case:<br><br>"parameters and/or information for analysis of social signatures"<br><br>2. Construction to which e.Digital agreed in the Dropcam case but declined to agree in this case:<br><br>"data structure associated with a social hierarchy and one or more social signatures" | data structure associated with a social hierarchy and a social signature | Not construed by Judge Tigar; e.Digital and Dropcam agreed to "data structure associated with a social hierarchy and one or more social signatures"<br><br>[*see* Ex. A, Judge Tigar's order at 12] |

As an initial matter, e.Digital mis-states ArcSoft's proposed construction. ArcSoft proposes "data structure ***associated with*** a social hierarchy and a social signature," not "data structure ***storing*** a social signature and a social hierarchy."

ArcSoft's proposed construction is almost identical to the one e.Digital agreed to in the Dropcam case.

## 1. parameters and/or information

e.Digital's proposed construction is unreasonably broad. "Parameters and/or information for analysis of social signatures" is a vaguely defined collection of guidelines or information that can be stretched to mean anything and will improperly expand the infringement reach of e.Digital's patents. In contrast, the specification discloses an organized data structure that is always associated with a social hierarchy and a social signature. The specification even gives examples of tables—data organized in a particular format—that are part of this data structure. [Ex. C, '522, Tables 1 and 2.]

Even the dictionary definitions that e.Digital seeks to rely on refer to a "pattern":

> e.Digital's proposed construction is also consistent with the plain and ordinary meaning of a template. The Merriam Webster Dictionary defines a "template" in part as "a gauge, mold or pattern that functions as a guide." (See Ex. J at 736.) Similarly, Barron's Dictionary of Computer and Internet Terms describes a "template" in part as a "pattern to be matched." (Ex. K at 492.)

[e.Digital's Br. at 10:8-12.] The Merriam-Webster Dictionary defines "pattern" as a "repeated form or design" or "the regular and repeated way in which something happens or is done."[3] A pattern, mold or design, but more importantly, the claims and specification, indicate a definitive, organized data structure, not a loose "set of parameters and/or information."

Further, the social template is not used "for analysis of social signatures," it corresponds to, contains or is associated with a social signature. [*See, e.g.*,'522, Claim 1; 16:26-64; Tables 1, 2.] A social signature is part of the social template. [*Id.*]

---

[3] http://beta.merriam-webster.com/dictionary/pattern

### 2.    a social signature

The claim recites "each **social template** corresponding to *a* unique **social signature.**"  The claim language thus supports one unique signature per template or the signature would not be unique.  Although the specification contains language "social signature or social signatures associated with each social template" [Ex. C, '522, 18:67-19:10], that language does not include the word "unique," as the claim does, and refers to any, non-unique signature.  The specification cannot be read into the claim to broaden its meaning; the language of the claim itself must be considered before and above any other claim construction evidence.  *See Cat Tech.*, 528 F.3d at 884 ("The appropriate starting point for claim construction 'is always with the language of the asserted claim itself.'") (citation omitted).  Because the claim language adds the limitation "unique," it narrows the meaning from just any signature to a specific, one-of-a-kind signature, of which there can be only one.  Thus the claims require a one-to-one relationship between each social template and each unique social signature.

ArcSoft's construction is consistent with the goal of the invention.  The unique social signature, indicative of a certain activity, determines what social template to use.  The template is then used to regulate access to the user or the amount of information shared about the user with the persons in the social hierarchy.

The specification also repeatedly recites "social templates" and "social signatures" in the plural form in parallel.  [*See, e.g.,*'522, 1:40-41, 3:35-37; 5:47-49.]  Because both templates and signatures are in the plural form (as opposed to having the template in the singular, and signatures in the plural form), this also supports the construction under which each of the multiple templates corresponds to only one of the multiple signatures, which is ultimately made explicit in the claim language "each **social template** corresponding to *a* unique **social signature.**"

III.  **CONCLUSION**

    Accordingly, e.Digital's constructions are overbroad and vague, and the Court should adopt ArcSoft's constructions.

Dated:  December 21, 2015          FISH & RICHARDSON P.C.


                                   By: */s/ Christopher S. Marchese*
                                        Christopher S. Marchese
                                        marchese@fr.com

                                   Attorneys for Defendant, ArcSoft, Inc.

# **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 21, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Any other counsel of record will be served by electronic mail and regular mail.

/s/ Christopher S. Marchese
Christopher S. Marchese
marchese@fr.com